## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COURTNEY SMALLWOOD, o/b/o
R.K.F., a minor child
                    *Plaintiff,*

        v.

NANCY A. BERRYHILL,[1] Acting
Commissioner of Social Security

                    *Defendant.*

CIVIL ACTION
NO. 16-3669

**PAPPERT, J.**                                    **November 7, 2017**

## <u>MEMORANDUM</u>

Plaintiff Courtney Smallwood, pursuant to 42 U.S.C. § 1383(c)(3)[2], seeks judicial

review of a decision by the Commissioner of Social Security denying her claim on behalf

of R.K.F., her minor child, for Supplemental Social Security Income ("SSI") under Title

XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.*  The Administrative Law Judge's

decision was upheld by the Appeals Council and Magistrate Judge Rueter subsequently

recommended that Smallwood's request for review be denied.[3]  Smallwood filed

objections to Judge Rueter's Report and Recommendation ("R&R") and now argues that

the Commissioner's decision should be overturned because the ALJ erred in finding

that R.K.F. did not exhibit marked impairments in the domains of acquiring and using

---

[1]     Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017.
Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Berryhill should be substituted for the former
Acting Commissioner, Carolyn Colvin, as the defendant in this action.  *See* FED. R. CIV. P. 25(d).

[2]     42 U.S.C. § 1383(c)(3) incorporates by reference 42 U.S.C. § 405(g).

[3]     A district court judge may refer an appeal of a decision of the commissioner to a magistrate
judge for a R&R.  *See* 28 U.S.C. § 636(b)(1).

information and attending and completing tasks.  For the reasons below, the Court overrules Smallwood's objections to the R&R and grants judgment in favor of the Commissioner.

## I

## A

R.K.F. was born on July 16, 2007.  (R. 188.)[4]  On April 15, 2013, when he was preschool-age, Smallwood protectively filed an application for SSI on his behalf. (R. 162–167, 188.)  He is currently a school-age child.  *See* 20 C.F.R. § 416.926a(g)(2). R.K.F.'s SSI application alleged disability as of February 1, 2013 due to attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), asthma and anemia.  (R. 61–62.)

On June 28, 2013, R.K.F.'s application for SSI was denied.  (R. 71–74.) Smallwood filed a request for a hearing which was held on November 19, 2014 before ALJ Jay Marku.  (R. 75–78, 37–57.)  On January 6, 2015, Judge Marku found that R.K.F. had "not been under a disability within the meaning of the Social Security Act since April 15, 2013 . . . ."  (R. 19.)  In reaching his conclusion, the ALJ explained that he had considered "objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; the claimant's statements (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all settings (i.e., at home, at school, and in the

---

[4]     The record, consisting of 645 numbered pages, was uploaded to ECF in piecemeal fashion. *See* ECF Nos. 8-1–8-12.  The Court will cite to the record page numbers rather than the specific ECF document identifiers.

community).'' (R. 22–23.)

Relying on the record evidence, the ALJ found that R.K.F. had not engaged in substantial gainful activity during the relevant time period. (R. 22.) He concluded that R.K.F.'s asthma and ADHD are "severe impairments," but found that neither R.K.F.'s asthma nor his ADHD were impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. §§ 416.924, 416.925 or 416.926. (*Id.*) He determined that it had not been established that R.K.F.'s "symptoms related to his asthma ha[d] been of sufficient severity such as to meet or medically equal the severities of any of the impairments described in [sections 103.03 and 3.03, Respiratory System]." (*Id.*) He also found that R.K.F. did "not meet[ ] the listing for 112.11 Attention Deficit Hyperactivity Disorder, as manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity." (*Id.*) Finally, the ALJ concluded that R.K.F. had: (1) "less than marked limitation in acquiring and using information;" (2) "less than marked limitation in attending and completing tasks;" (3) "less than marked limitation in interacting and relating with others;" (4) "no limitation in moving about and manipulating objects;" (5) "less than marked limitation in the ability to care for himself" and (6) "no limitation in health and physical well-being." (R. 28–33.) As a result of these conclusions, the ALJ determined that R.K.F. "does not have an impairment or combination of impairments that result in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning" and therefore R.K.F. was found to be ineligible to receive SSI. (R. 33.)

On May 14, 2016, the Appeals Council denied Smallwood's request for review. (R. 1-6.) On July 5, 2016, Smallwood's complaint was filed in this action after she was

granted leave to proceed *in forma pauperis*. (Compl., ECF No. 3.) She filed a brief and statement of issues in support of her request for review on December 23, 2016 and the Commissioner filed a response on January 23, 2017. (Pl.'s Br., ECF No. 13, Def.'s Resp., ECF No. 14.) Magistrate Judge Rueter issued his R&R recommending denial of Smallwood's request for review on April 4, 2017. (R&R, ECF No. 19.) He found that substantial evidence supports the ALJ's conclusions that R.K.F. has less than marked limitations in the domain of acquiring and using information and in the domain of attending and completing tasks. (*Id.* at 16–22). Smallwood filed objections on April 18, 2017. (Pl.'s Objs., ECF No. 20.) The Commissioner filed a response on May 2, 2017. (Def.'s Resp. to Pl.'s Objs., ECF No. 22.)

## B

The Court has reviewed the decision of the ALJ along with the entire administrative record and summarizes here the evidence relevant to Smallwood's request for review of the ALJ's functional equivalence determination relevant to R.K.F.'s ADHD.

### i

R.K.F.'s mother's hearing testimony, which the ALJ recounted in his decision, cited both positive and negative aspects of her son's behavior. (R. 23.) *See also* (R. 46–56). On the positive side, Smallwood testified that, at home, R.K.F. was "good and helpful," "play[ed] with his brother and sister," and "doesn't lose his temper . . . ." (R. 23.) *See also* (R. 49). The ALJ also cited Smallwood's testimony that R.K.F. "has friends at school and home . . . and he gets along well with them." (R. 23.) *See also* (R. 53–54). Conversely, the ALJ reported that Smallwood explained that R.K.F. "gets

frustrated at school if he doesn't get undivided attention from a teacher" and that he had thrown a chair at a teacher two weeks prior to the hearing. (R. 23.) *See also* (R. 46). The ALJ explained that Smallwood testified that R.K.F. "wants one-on-one attention in school, as he gets at home" and that "[a]t school, he'd rather color than do his school work." (*Id.*) *See also* (R. 49, 55). She testified that as a second grader at the time of the hearing, R.K.F. was in "regular classes," but was "pulled out for extra services in reading and math, and he [was] 2-3 reading levels behind the other kids." (R. 23) *See also* (R. 47-48). The ALJ also noted Smallwood's testimony that R.K.F. took medication for ADHD, that he had been on Strattera and took Clonidine at night, but was "changing medications . . . , as they are still trying to find the right ones." (R. 23.) *See also* (R. 51–52) (stating that R.K.F. had taken Vyvanse and was "about to be starting" Focalin). She testified that R.K.F. was "worse when he does not take his medications." (R. 23) *See also* (R. 53). After reviewing the other record evidence, the ALJ concluded that Smallwood's "statements concerning the intensity, persistence and limiting effects of [R.K.F.'s] symptoms [were] not entirely credible . . . ." *(*R. 24.)

### ii

In conjunction with Smallwood's testimony, the ALJ considered R.K.F.'s school records, including teacher questionnaires completed by his kindergarten and second grade teachers. (R. 24–25.) In May 2013, R.K.F.'s kindergarten teacher Jessica Sandford completed a teacher questionnaire evaluating his performance in each of the six domains. (R. 198–209.) Relevant here, her questionnaire response reflected that in the functional domain of acquiring and using information, R.K.F. had "'an obvious problem' in the subcategory of expressing ideas in written form" but either only "a

slight problem" or "no problem" in all of the other subcategories. (R. 199.) Sandford's questionnaire noted that R.K.F. had some difficulty working independently and he would get frustrated quickly, sometimes throwing things or refusing to complete work. (*Id.*) In the functional domain of attending and completing tasks, the ALJ explained Sandford found R.K.F. "had a 'very serious problem' in the subcategory of working at a reasonable pace/finishing on time" and "'a serious problem' in the subcategories of changing from one activity to another without being disruptive, and completing class/homework assignments." (R. 24.) *See also* (R. 200). R.K.F. also "had 'obvious problems' in the areas of focusing long enough to finish assigned tasks, refocusing to task when necessary, and working without distracting others." (R. 200.) Sandford's questionnaire response indicated that R.K.F. "had 'no problem' to a 'slight problem' in . . . all other subcategories within that domain." (*Id.*) The ALJ noted Sandford's finding that R.K.F. had "trouble with stopping an activity and transitioning to the next task, frustration, and throwing tantrums." (R. 25.) Sandford's questionnaire response also documented certain subcategories with "serious" or "very serious" problems in the functional domains of interacting and relating with others and caring for himself, but Smallwood does not challenge the ALJ's findings with respect to those domains. (R. 201, 203.) The ALJ also explained that in the section of Sandford's questionnaire addressing the domain of health and physical well-being, her response indicated that R.K.F. takes medication on a regular basis and his behavior had improved since starting medication. (R. 25.) *See also* (R. 205).

The ALJ noted that for the 2013–2014 academic year, (first grade), R.K.F. "received three grades of D, in reading, writing, and mathematics, in addition to three

grades each of A and B." (R. 24.) That year, R.K.F. was absent for 20 days of school and was late on 43 days. (*Id*.) In March 2014, R.K.F. "underwent psycho-educational evaluation . . . upon referral from his mother for help in math and reading . . . . His full scale IQ was 86 (low average range). Working skills memory was found to be an area of needed development" and R.K.F. was determined "to be eligible for special education services." (*Id*.) In May 2014, at the end of first grade, an individualized education plan ("IEP") was developed for R.K.F. (*Id*.) The ALJ also observed that in 2014, R.K.F. received in-school wrap around services through Community Council Health Systems. (*Id*.)

### iii

The ALJ also discussed the responses of R.K.F.'s second grade teacher, Lauren Beeley, to a Teacher Questionnaire she completed after R.K.F. had attended two weeks of classes. (R. 25.) *See also* (R. 349-356). Beeley reported that R.K.F. was below grade level in reading, math and written language. (R. 349.) In the domain of acquiring and using information, Beeley reported that R.K.F. exhibited "serious" problems in reading and comprehending written material and expressing ideas in written form. (R. 350). He also exhibited an "obvious" problem in learning new material and recalling and applying previously learned material. (*Id*.) R.K.F. had either "slight" or "no" problems in all other subcategories in this domain. (*Id*.) Beeley wrote that R.K.F. would "get easily frustrated when doing independent work" and "ask[ed] for direct, individual help often, even when he seem[ed] to understand the material." (*Id*.) In the domain of attending and completing tasks, as the ALJ explained, Beeley noted that R.K.F. had a "very serious" problem in the subcategory of working at a reasonable pace/finishing on

time and "serious" problems in the subcategories of completing work accurately without careless mistakes and completing class/homework assignments. (R. 25.) *See also* (R. 351). Beeley reported "no" problems in all other subcategories in the domain. (R. 351). The ALJ wrote: Beeley "noted that [R.K.F.] receives help from a special education teacher and differentiated work in the classroom, but fails to finish assignments often unless he gets direct help." (R. 25) *See also* (R. 351). As the ALJ also explained, in the domain of caring for himself, Beeley "found [R.K.F.] to have 'an obvious problem' in the areas of identifying and appropriately asserting emotional needs, handling frustration appropriately, responding appropriately to changes in mood, and using appropriate coping skills to meet the daily demands of the school environment." (R. 25) *See also* (R. 354). Beeley reported no problems in the functional domains of interacting and relating with others and moving about and manipulating objects. (R. 352–353.) In the domain of health and physical well-being, Beeley noted that R.K.F. took medication on a regular basis, although she was unsure of its name. (R. 355.) As the ALJ explained, Beeley's questionnaire reported that R.K.F. "stays calmer and tries harder without getting frustrated as easily" when he takes his medication. (*Id.*) *See also* (R. 25).

The ALJ ultimately found that the opinions of R.K.F.'s kindergarten and second grade teachers did not support R.K.F.'s "contention that his impairments, particularly his mental impairment, functionally equal[led] a listing." (R. 26.) The ALJ explained that "[w]hile [R.K.F.] had what were considered "serious" and even a few "very serious" problems . . . , the large majority of subcategories assessed . . . indicated 'no' to "slight' or 'obvious' problems." (*Id.*) He explained that "[s]ome improvements between

Kindergarten and 2nd Grade in the various problem areas were indicated, and both teachers noted improvement with medication." (*Id.*) Specifically, the ALJ cited the discrepancy between the kindergarten teacher's observations that R.K.F. had problems in the domain of interacting and relating with others and his second grade teacher's finding that R.K.F. exhibited no limitations in the same domain. (*Id.*) The ALJ also explained that the kindergarten teacher found several areas to be a very serious problem in the subcategory of working at a reasonable pace/finishing on time, while the second grade teacher noted only one very serious problem in the same subcategory. (*Id.*) Additionally, the ALJ pointed to the kindergarten teacher's comment that after starting medication, R.K.F. had only had two tantrums. (*Id.*) The ALJ concluded that "[w]ith continuation in therapy and with stabilization of medications, as well as special education services, continued improvement would be expected." (*Id.*)

### iv

The ALJ also reviewed R.K.F.'s medical records including a bio-psychosocial evaluation at Juniata Community Mental Health Clinic in April 2013, where he was diagnosed with ADHD and given a Global Assessment of Functioning ("GAF") score of 55. (R. 24.) *See also* (R. 328-332.) Between April 2013 and November 2013, R.K.F. "attended a few outpatient therapy sessions . . . ." (R. 24.) Also in April 2013, R.K.F. "was prescribed psychotropic medications, with regular psychiatric/medication check appointments noted into 2014." (*Id.*)

R.K.F. had a second bio-psychosocial evaluation in July 2014, this time at Northeast Community Mental Health Center. (R. 334–344.) He was again diagnosed with ADHD and given a GAF score of 45. (R. 344.) *See also* (R. 24.) R.K.F. resumed

outpatient therapy that month. (R. 24.) In September 2014, he returned to Juniata for a third bio-psychosocial evaluation, where he was diagnosed with ADHD, ODD, intermittent explosive disorder (IED) and a learning disorder not otherwise specified. (R. 424–428.) *See also* (R. 24). R.K.F. had a GAF score of 50. (R. 427.) He began therapy at Juniata and was given a prescription for Vyvanse and Clonidine. (*Id.*) *See also* (R. 24.) His Vyvanse dosage was increased that October. (R. 422.) *See also* (R. 24.) The ALJ reported that R.K.F.'s September 2014 "[m]ental status examination showed normal intelligence, normal range of mood/affect, thought content unremarkable, thought process normal, perception normal, good memory, oriented x3, insight and judgment good, but with anger/fights, agitation and poor sleep." (R. 24.)

**v**

In reaching his decision, the ALJ also considered records of R.K.F.'s evaluation by state disability determination services assessors. Doctor Catherine Smith, who was board certified in obstetrics and gynecology and maternal and fetal medicine (R. 316), found that R.K.F. exhibited a "less than marked" limitation in the domain of health and physical well-being and no limitations in any other domain. (R. 66.) She remarked that R.K.F. had asthma that was "well controlled as long as [he] does not get a [upper respiratory infection]." (*Id.*) The ALJ gave her opinion "some weight" as to R.K.F.'s "limitations as caused by his physical impairment . . . ." (R. 26.)

Doctor Anthony Galdieri, a clinical psychologist (R. 318), determined that R.K.F. had "no limitation" in the domains of acquiring and using information, moving about and manipulation of objects and health and physical well-being. (R. 65.) He found that R.K.F. exhibited "less than marked" limitations in the domains of attending and

completing tasks, interacting and relating with others and caring for himself. He remarked that R.K.F. exhibited "[n]ormal general intellectual functioning, labile/mood affect, good memory, fair judgment and insight. Refuses to do work, hyperactive, kicked chairs in school, worse in school, poor sleep. D[iagnosed] ADHD, ODD[,] GAF 55 indicating a moderate degree of impact on global level of functioning." (R. 65.) The ALJ gave Dr. Galdieri's opinion "great weight," but noted that "additional limitations in the domain of Acquiring and Using Information can be found based upon the later evidence received." (R. 26.)

## II

The Court reviews *de novo* those portions of the R&R to which Smallwood has objected. *See* 28 U.S.C. § 636(b)(1); *see also Brown v. Astrue,* 649 F.3d 193 (3d Cir. 2011). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(c). In reviewing the ALJ's decision, the Court is not permitted to weigh the evidence or substitute its own conclusions for those reached by the ALJ. *See Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Rather, the Court reviews the ALJ's findings to determine whether they were supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

Substantial evidence is evidence that a "reasonable mind might accept as adequate to support a conclusion." *Rutherford*, 399 F.3d at 552 (internal quotations omitted). "It is 'more than a mere scintilla but may be somewhat less than a preponderance of the evidence.'" *Id.* (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). If the decision of the ALJ is supported by substantial evidence,

the Court may not set it aside "even if [the Court] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)). The ALJ's decision "must therefore present a sufficient explanation of the final determination in order to provide the reviewing court with the benefit of the factual basis underlying the ultimate disability finding." *D'Angelo v. Colvin*, No. 14-6594, 2016 WL 930690, at *1 (E.D. Pa. Mar. 11, 2016) (citing *Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir. 1981)). The decision need only discuss the most relevant evidence concerning a claimant's disability, "but it must provide sufficient discussion to allow the reviewing Court to determine whether its rejection of potentially significant evidence was proper." *Id.* (citing *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203–04 (3d Cir. 2008)).

### III

To determine whether a child is disabled for the purpose of receiving SSI, an ALJ uses a three-part analysis. 20 C.F.R. § 416.924. First, the ALJ considers whether the child is engaged in substantial gainful activity. *Id.* § 416.924(b). Second, the ALJ considers whether the child has "a medically determinable impairment(s) that is severe." *Id.* § 416.924(c). Third, the ALJ considers if the child has an impairment or combination of impairments that "meet, medically equal, or functionally equal . . . the severity of a set of criteria for an impairment in the listings . . . ." *Id.* § 416.924(d). To make a functional equivalence determination, the ALJ assesses a child's functioning in terms of six domains including, relevant here, acquiring and using information, *id.* § 416.926a(g), and attending and completing tasks. *Id.* § 416.926(i). A child will be declared "disabled" and thus entitled to receive SSI benefits only if he or she has an impairment or combination of impairments resulting in "'marked' limitations in two

domains of functioning or an 'extreme' limitation in one domain . . . ." *Id.* § 416.926(a).

A limitation that is "extreme" is one that interferes "very seriously" with the ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(3). A "marked" limitation is one that "interferes seriously" with the ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(2). Such a limitation is "more than moderate" but "less than extreme." *Id.* When evaluating the effects of a child's impairment on his functioning, the Commissioner considers factors including how the child's functioning compares to the functioning of children of the same age without impairments, the combined effects of multiple impairments and how well the child can initiate, sustain and complete activities. 20 C.F.R. § 416.924a(b).

In her brief in support of her request for judicial review of the ALJ's decision, Smallwood contends that the ALJ erred in failing to find that R.K.F. exhibited marked impairments in the domains of acquiring and using information and attending and completing tasks. (ECF No. 13 at 2). In her objections to the R&R, Smallwood reiterates her arguments that R.K.F. should have been found to have marked limitations in both the domain of acquiring and using information and the domain of attending and completing tasks. (ECF No. 20 at 1, 8.) Smallwood contends that she "does not ask this Court to re-weigh the evidence," but "argues that the ALJ committed legal error in failing to consider evidence cited in [her] brief that supports a finding of marked impairments in the domains of acquiring and using information and attending and completing tasks." (*Id.* at 6.) Because Smallwood does not contend that R.K.F. exhibited an "extreme" limitation in any one domain, as the Commissioner argues, "to

warrant remand, both of [Smallwood's] arguments must prevail. . . .  An error in the degree of limitation in one functional domain or the other would not have any effect on the outcome of [Smallwood's] claim because [R.K.F.] must have marked limitations in two functional domains."  (ECF No. 22 at 2 n.2.)

## A

### i

The Court considers first Smallwood's objection that the R&R affords undue deference to the ALJ's conclusion that R.K.F. had a "less than marked" impairment in the domain of "acquiring and using information."  (ECF No. 20 at 1.)  Under the Social Security regulations, the domain of acquiring and using information considers how well a claimant acquires and learns information and uses the information learned.  20 C.F.R. § 416.926a(g).  The regulation provides examples of limited functioning in the domain of acquiring and using information including:  a lack of "understanding of words about space, size, or time"; inability to "rhyme words or the sounds in words"; "difficulty recalling important things learned in school yesterday"; "difficulty solving mathematics questions or computing arithmetic answers" and speaking "in short, simple sentences and hav[ing] difficulty explaining what you mean."  *Id.* § 416.926a(g)(3).

In support of her first objection, Smallwood cites 20 C.F.R. § 416.926a(e)(2), which provides that a claimant's "day-to-day functioning may be seriously limited when [his or her] impairment(s) limits only one activity or when the interactive and cumulative effects of [his or her] impairment(s) limit several activities."  She argues that there is a basis for finding that R.K.F. had a marked impairment in the domain of

14

acquiring and using information because he exhibited an "area of 'serious' concern . . . in 'reading and comprehending written material' and 'expressing ideas in written form.'" (ECF No. 20 at 2.) Smallwood asserts that "[t]hese are critical areas upon which any type of learning depends" and that "[i]f there is any activity that the regulations intend, could by itself, form the basis of a finding of marked impairment, it would be in the ability to read and comprehend." (*Id.*)

Smallwood's objection disregards the ALJ's acknowledgement of R.K.F.'s difficulties with reading and writing. The ALJ explained that

> [t]he claimant has some difficulty in the areas of reading and comprehending written material, expressing ideas in written form, working independently, learning new material, and recalling and applying previously learned material. He sometimes gets frustrated, especially when working alone, and would sometimes refuse to complete the work or throw a tantrum. He would also ask for individual help frequently, even when not always necessary.

(R. 28.) The ALJ specifically addressed R.K.F.'s teachers' questionnaire responses regarding this domain. *See* (R. 24–25.) He compared R.K.F.'s kindergarten teacher's opinion that he had serious problems in reading and comprehending written material and expressing ideas in written form (R. 350) with R.K.F.'s second grade teacher's opinion that R.K.F. exhibited only a slight problem in reading and comprehending written material and an obvious problem in expressing ideas in written form. (R. 199.) The ALJ also explained that R.K.F.'s teachers observed that he exhibited slight or no problems in many of the activities listed under the domain of "acquiring and using information." (R. 24-25.) *See also* (R. 199, R. 250). There is more than a "mere scintilla" of evidence in the record to support the ALJ's conclusion that, even though R.K.F. exhibited difficulties in reading and comprehending written material and

expressing ideas in written form, he had a "less than marked" limitation in the domain of acquiring and using information.

### ii

Smallwood also argues that "an adjudicator must consider 'the effects of structured or supportive settings' in assessing a child's limitations.'" (ECF No. 20 at 2) (quoting 20 C.F.R. § 416.926a(a)(1).) She faults the ALJ for finding that R.K.F. does not exhibit marked limitations in acquiring and using information because he "does better in the home setting than in school." (*Id.* at 2.) She argues that R.K.F.'s "ability to perform better in a structured, on-on-one setting . . . demonstrates that he needs such a structured setting in order to succeed." But the ALJ was not required to consider R.K.F.'s classroom performance in isolation. Instead, the relevant inquiry for the ALJ is how well a child functions in all settings, including at home and at school. *See* 20 C.F.R. § 416.926a(b) ("We will look at the information we have in your case record about how your functioning is affected during *all of your activities* when we decide whether your impairment or combination of impairments functionally equals the listings. Your activities are everything you do at *home*, at *school*, and in your community.") (emphasis added); *see also* 20 C.F.R. § 416.926a(g) ("When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned . . . . You will also need to use these skills in daily living situations at home and in the community . . . .").

The ALJ's decision acknowledged that R.K.F. "received in-school wrap around services during 2014 through Community Council Health Systems" (R. 24) and

considered Beeley's observation that R.K.F. "receive[d] help from a special education teacher." (R. 25.) He also acknowledged that when R.K.F. receives "more direct attention," such as at home, he displays fewer challenges in the domain of acquiring and using information. (R. 28). Ultimately, the Court finds that the ALJ considered "the effects of structured or supportive settings" in assessing R.K.F.'s limitations when he compared the record evidence addressing R.K.F.'s performance both at home and at school.

### iii

Smallwood also argues that the evidence of record does not reasonably support the ALJ's conclusion that R.K.F. functions better when taking his medication on a regular basis. (ECF No. 20 at 2.) She contends that "there is no evidence to support that [R.K.F.'s teachers] had reliable knowledge of when [R.K.F.] was taking his medications and when he was not." (*Id.* at 2-3.) The ALJ, appropriately, did not rely only on the reports of R.K.F.'s teachers when reaching his conclusion that medication had a positive impact on his function in this domain. The Social Security regulations provide that the evidence to be considered in making a disability determination "may include information from medical sources (such as [a claimant's] pediatrician or other physician; psychologist; qualified speech-language pathologist; and physical, occupational, and rehabilitation therapists) and nonmedical sources (such as [a claimant's] your parents, teachers, and other people who know [the claimant])." 20 C.F.R. § 416.924a.

Review of the ALJ's functional equivalency analysis shows that his determination appropriately considered a broad range of evidence regarding the impact

of medication on R.K.F.'s function. In addition to the questionnaire responses of R.K.F.'s teachers, the ALJ considered all of the record evidence regarding R.K.F's use of medications and their impact on his performance, including three bio-psychosocial evaluations and outpatient therapy notes. *See, e.g.* (R. 24) ("[h]e was prescribed psychotropic medications, with regular psychiatric/medication check appointments noted into 2014" and "[d]osage of Vyvanse was increased in October"); *see also* (R. 26) ("His medications have been switched and dosages adjusted in an attempt to find the right mix, with some expected disruptions in behaviors."). Substantial evidence supports the ALJ's conclusion that medication had a positive impact on R.K.F.'s function in this domain. *See Cortes ex rel. J.C. v. Comm'r of Soc. Sec.*, No. 11- 5819, 2013 WL 795599, at *5 (D.N.J. Mar. 4, 2013) (finding substantial evidence supported the ALJ's determination that the claimant had a "less than marked limitation" where "the ALJ acknowledged that Claimant had problems with focus and attention, but recognized that Claimant and his mother both testified that his problems with focus and attention were improving on medication"). *C.f. L.B. On Behalf of S.B. v. Comm'r of Soc. Sec.*, No. 16- 08512, 2017 WL 4074024, at *5 (D.N.J. Sept. 14, 2017) (remanding to the Commissioner where, "although the ALJ determined that S.B. had less than marked limitation in Acquiring and Using Information because medication appropriately limited the effects of her ADHD, the ALJ did not cite information in S.B.'s educational records which demonstrated ongoing academic difficulties").

### iv

Smallwood also objects that R.K.F.'s IQ score should "not control the analysis" when "a child is not able to make use of his intelligence due to a medical condition such

as ADHD . . . ." (ECF 20 at 3.) She argues that "even by second grade, RKF had already fallen behind in his reading level by two grades. This is quite significant and outweighs any innate intelligence that Plaintiff's medical condition prevented him from using to its fullest." (*Id.*) But here again, R.K.F.'s IQ score was not the only factor the ALJ considered in making his determination with respect to this domain. *See* 20 C.F.R. § 416.926a(e)(4) (providing that an ALJ will consider a claimant's test scores together with the other information available about the claimant's functioning). Indeed, the ALJ's analysis also specifically considered R.K.F.'s deficits in reading and math. (R. 23.) ("He gets pulled out for extra services in reading and math, and he is 2-3 reading levels behind the other kids.") He weighed evidence of these difficulties with reading and math against R.K.F.'s full-scale IQ score, which was an 87, in the low average range for children of his age. (R. 280.) On the record as a whole, which includes R.K.F's IQ score and other evidence regarding his academic performance, there is evidence that a "reasonable mind might accept as adequate to support a conclusion" that R.K.F. did not exhibit a marked limitation in the domain of acquiring and using information. *Rutherford*, 399 F.3d at 552. This objection does not require the Court to overturn the ALJ's determination.

**v**

Smallwood also argues that the ALJ inappropriately dismissed "the significant problems raised in the progress notes of the [therapeutic support staff ("TSS")] worker by speculatively assuming that RKF's assignment to special education services and wrap around services 'should help to address' his deficits in this domain." (ECF No. 20 at 3–4) (citing R. 28). She argues that "[t]he ALJ must base his findings on the

evidence of record, and not on speculation about what improvements may occur in the future" and that, "[a]t minimum, the ALJ's failure to consider the probative TSS worker's progress notes . . . . supports a remand to the ALJ for further consideration of Plaintiff's level of progress as of the date of the ALJ's decision . . . ." (*Id.* at 4.) The ALJ is not, however, required to "discuss in [his] opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). And here he did, in fact, consider Smallwood's testimony that R.K.F. had "hit his TSS workers because he didn't get his way and had to be restrained." (R. 23.) The ALJ understood that R.K.F. was receiving "wrap around in-school services" in addition to "special education services in reading . . . ." (R. 28.) Thus, the ALJ explained that in evaluating R.K.F.'s limitations he had "considered the type, extent, and frequency of help [R.K.F.] needs to function" consistent with the requirements of 20 C.F.R. § 416.926a(b) and (c). (R. 23.) Notwithstanding the ALJ's speculative comment that R.K.F.'s assignment to special education services "should help" to address the problem areas which he exhibited at school (R. 28), the Court finds that when the record is viewed as a whole, substantial evidence supports the ALJ's conclusion that R.K.F. has a less than marked limitation in acquiring and using information.

The Court will overrule Smallwood's objection to the R&R's finding that the ALJ's determination in the domain of acquiring and using information is supported by substantial evidence.

## B

Smallwood's second objection is that the Report and Recommendation errs in finding that the ALJ appropriately concluded that R.K.F. does not have a marked

impairment in the domain of attending and completing tasks. (ECF No. 20 at 5.) Under the Social Security regulations, the domain of attending and completing tasks considers how well a claimant is able to focus and maintain attention and how well the claimant begins, carries through and finishes his or her activities, including the pace at which the claimant performs activities and the ease with which he or she changes them. 20 C.F.R. § 416.926a(h). Examples of limited functioning in attending and completing tasks that an ALJ may consider in determining whether a claimant has a "marked" limitation include: being easily startled, distracted or overreactive to touch, movements, sounds or sights; being slow to focus on or failing to complete activities of interest such as games or art projects; frequently becoming sidetracked from activities or frequently interrupting others; giving up on tasks; and requiring extra supervision to stay engaged in an activity. *See id.* § 416.926a(h)(3). A claimant exhibiting any of these examples will not, however, necessarily be designated as having a "marked" or "extreme" limitation. *Id.* The regulations require an ALJ to "consider all of the relevant information in [a claimant's] case record" when determining whether the claimant has a marked or extreme limitation in the domain of attending and completing tasks. *Id.*

**i**

Even if the Court had reached a different conclusion with respect to Smallwood's first objection, she would not prevail in her request for review because the Court finds that substantial evidence supports the ALJ's finding that R.K.F. had a less than marked limitation in the domain of attending and completing tasks. The ALJ explained that

> [t]he claimant has some difficulties in the areas of changing from one activity to another without being disruptive, completing class/homework assignments, completing work accurately without careless mistakes, carrying out multi-step instructions, focusing long enough to finish assigned tasks, refocusing to tasks when necessary, working without distracting others, and working at a reasonable pace/finishing on time. He has trouble stopping one activity and transitioning to the next task, finishing assignments unless he gets direct help, gets frustrated, and has thrown tantrums. However, the claimant receives help from a special education teacher and receives accommodations in the classroom, and has exhibited improvement on medication.

(R. 29.) In making this determination, the ALJ relied on his review of Smallwood's testimony, R.K.F.'s teachers' questionnaire responses, his medical records including the results of three bio-psychosocial evaluations and the conclusions of the state disability determination services assessors. The ALJ explained that he had evaluated how R.K.F. functioned "in all settings and at all times[ ] as compared to other children the same age who do not have impairments" and that he had "assessed the interactive and cumulative effects of all of [R.K.F.'s] medically determinable impairment[s], including any impairments that are not "severe" in all of the affected domains." (R. 23.)

Smallwood argues that the ALJ did not afford sufficient weight to evidence that R.K.F.'s kindergarten and second grade teachers identified him as having "a 'very serious,' or extreme, limitation in his ability to work at a reasonable pace and finish on time." (ECF No. 20 at 5) (citing R. 200, 351). In support of her argument, she observes that his kindergarten teacher "specified that such problems occurred on an hourly basis throughout the school day." (*Id.*) (citing R. 200). Smallwood does not, however, note that the ALJ specifically observed that R.K.F.'s teacher questionnaire responses reflected "[s]ome improvements between Kindergarten and 2nd Grade" in this domain. The ALJ considered R.K.F.'s teachers' reported concerns with respect to his ability to

work at a reasonable pace and appears to have weighed them appropriately along with his teachers' ratings regarding R.K.F.'s other activities within the domain of attending and completing tasks. Substantial evidence supports his determination with respect to how much weight to give to R.K.F.'s teachers' concerns regarding his ability to work at a reasonable pace and Smallwood's objection does not require the Court to upset the ALJ's finding.

**ii**

Smallwood also complains that the ALJ improperly bases his determination on his conclusion that R.K.F. "has had fewer tantrums since being on medication," *see* (R. 28), arguing that the teachers "could not know when RKF was taking his medications and when he was not." (ECF No. 20 at 5.) Having already rejected her corresponding argument above, the Court finds that the ALJ's conclusion that medication had a positive impact on R.K.F.'s function in the domain of attending and completing tasks is supported by substantial evidence.

In her objection addressing the ALJ's determination with respect to the domain of attending and completing tasks, Smallwood also reiterates her objection that "[t]he ALJ did not provide any reasoned analysis of the TSS worker's progress notes . . . ." (*Id.* at 6.) She complains that the ALJ was obligated to consider whether R.K.F.'s functioning within this domain "can only be controlled with . . . structured individual attention" such as the attention of the TSS worker who "worked with RKF on a one-on-one basis, providing uninterrupted guidance to him throughout the school day." (*Id.*) Here again, the Court finds that the ALJ appropriately "considered the type, extent, and frequency of help [R.K.F.] needs to function" (R. 23) when he made his

determination regarding R.K.F.'s ability to attend and complete tasks. The Court does not dispute that there is record evidence that draws attention to R.K.F.'s behavioral difficulties with respect to attending and completing tasks, but both the ALJ and the Magistrate Judge addressed this evidence. *C.f. Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) ("[T]he ALJ may weigh the credibility of the evidence, [and] he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."). Therefore, the Court will overrule Smallwood's objection to the R&R's finding that the ALJ's determination in the domain of attending and completing tasks is supported by substantial evidence.

## C

For the above reasons, the Court will overrule Smallwood's objections, approve and adopt Magistrate Judge Rueter's Report and Recommendation finding that the ALJ's disability determination is supported by substantial evidence and grant judgment in favor of the Commissioner.

An appropriate order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.